# In the United States Court of Federal Claims

No. 25-1128
(Filed: May 22, 2026)
(Reissued for Publication: July 22, 2026)[1]

```
*****************************************
SALLYPORT GLOBAL SERVICES, LTD.,        *
                                        *
                Plaintiff,              *
                                        *
v.                                      *
                                        *
THE UNITED STATES,                      *
                                        *
                Defendant,              *
                                        *
and                                     *
                                        *
VECTRUS SYSTEMS LLC,                    *
                                        *
                Defendant-Intervenor.   *
*****************************************
```

*Paul F. Khoury*, Wiley Rein LLP, Washington, DC, counsel for Plaintiff. With whom were *Gary S. Ward, W. Benjamin Phillips, III*, *Johnathan C. Clark*, and *Vaibhavi Patria*, of counsel.

*Margaret J. Jantzen*, U.S. Department of Justice, Civil Division, Washington, DC, counsel of record for Defendant. With whom was *Hector M. Riverahernandez*, United States Department of the Air Force, of counsel.

*Michael F. Mason*, Hogan Lovells US LLP, Washington, DC, counsel for Defendant-Intervenor. With whom were *Thomas B. Hunt*, Tysons, VA, and *Ashley M. Ruhe*, Washington, DC, of counsel.

---

[1] The Court initially filed this opinion under seal on May 22, 2026, [ECF 69], pursuant to the amended protective order entered on July 21, 2025, [ECF 29]. The Court also ordered the parties to file a joint status report that "identifies information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion and Order." [ECF 69] at 31. The parties filed their joint status report on June 18, 2026, proposing redactions for consideration by the Court, but the parties did not agree on the proposed redactions. [ECF 73] at 1. Following a status conference on June 30, 2026, [ECF 74], the Court filed a proposed redacted version of the opinion on the docket under seal, [ECF 75-1], and invited the parties to request additional redactions with justifications for such redactions by July 17, 2026, [ECF 75]. The Court advised that the proposed redacted version would be issued on the public docket if no request for additional redactions is received. As of July 21, 2026, the parties have not requested any additional redactions. Accordingly, the Court issues the proposed redacted version shared with the parties on July 7, 2026. Redactions are denoted with three asterisks in brackets, e.g. [* * *], or by the use of the generic labels "Contractor A," "Subcontractor A," "Subcontractor B," and "Owner A." Separately, the Court edits citations to reflect the amended protective order and incorporates minor typographical and grammatical corrections.

**<u>OPINION AND ORDER</u>**

**DIETZ, Judge.**

Sallyport Global Services, Ltd. ("Sallyport") alleges that the United States Department of the Air Force ("Air Force") improperly awarded a sole source contract to Vectrus Systems LLC ("Vectrus") for Base Operations Support, Base Life Support, and Security ("BBS") services at the Martyr Brigadier General Ali Flaih Air Base ("AFAB") in the Republic of Iraq ("Iraq"). Before the Court are the government's and Vectrus's respective motions to dismiss Sallyport's protest for lack of standing pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") and the parties' respective cross-motions for judgment on the administrative record pursuant to RCFC 52.1. For the reasons set forth below, the Court finds that Sallyport has standing to bring its claims but that it fails to demonstrate that the Air Force's sole source award to Vectrus was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Accordingly, the Court **DENIES** the government's and Vectrus's motions to dismiss, **DENIES** Sallyport's motion for judgment on the administrative record, and **GRANTS** the government's and Vectrus's motions for judgment on the administrative record.

## I.    BACKGROUND

Sallyport challenges the Air Force's decision to award a sole source contract to Vectrus under the Foreign Military Sales ("FMS") program. Compl. [ECF 1] ¶¶ 1-2. Before addressing the parties' respective motions, the Court provides an overview of the statutory and regulatory framework underpinning the FMS program, the facts giving rise to Sallyport's claims, and the procedural history of this case.

### A.    FMS Program

The FMS program is a form of security assistance authorized by the Arms Export Control Act ("AECA"). *See* 22 U.S.C. §§ 2761-68. Under the AECA, Congress "authorizes sales by the United States Government to friendly countries . . . in furtherance of the security objectives of the United States[.]" *Id.* § 2751. Congress authorizes the President of the United States to

> enter into contracts for the procurement of defense articles or defense services for sale . . . to any foreign country . . . if such country . . . provides . . . a dependable undertaking [] to pay the full amount of such contract . . . and [] to make funds available in such amounts and at such times as may be required to meet the payments required by the contract[.]

*Id.* § 2762. In the Defense Federal Acquisition Regulation Supplement ("DFARS"), the U.S. Department of Defense ("DoD") sets forth "policies and procedures for acquisitions for [FMS] under [the AECA]." DFARS 225.7300(a). Under these policies and procedures, "[t]he U.S. Government sells defense articles and services to foreign governments . . . through FMS agreements." DFARS 225.7301(a). The underlying procurement between the United States and

2

the prospective contractor is conducted using "the same acquisition and contract management procedures used for other defense acquisitions." DFARS 225.7301(b).

The Defense Security Cooperation Agency ("DSCA") "directs, administers, and provides DoD-wide guidance to the DoD Components and DoD representatives to U.S. missions abroad for the execution of DoD security assistance and security cooperation programs[.]" DoD, Directive No. 5105.65, Defense Security Cooperation Agency (DSCA) ¶ 3 (2023). This guidance is set forth in the Security Assistance Management Manual ("SAMM"). *See id.* ¶ 5.i. The SAMM "provides DoD-wide guidance to . . . the Military Departments . . . engaged in the management or implementation of [the FMS program]" and "is mandatory for use by all DoD [c]omponents," though deviations may be permitted with prior approval of DSCA. DSCA, Authorization Letter (2012), https://samm.dsca.mil/listing/authorization-letter [https://perma.cc/B34G-LZ2L].

According to the SAMM, the FMS process "begins when an eligible foreign country . . . requests information on defense articles or services, including training, being considered for purchase." DSCA, SAMM § C5.1.1. (2012), https://samm.dsca.mil/chapter/chapter-5# [https://perma.cc/NUH6-7TAC]. The eligible foreign country is referred to as the "FMS purchaser" or "FMS customer," *see generally* § C5.1., and the U.S. military department or defense agency authorized to receive such request is referred to as the "implementing agency," DCSA, SAMM § C1.3.2.6. (2012), https://samm.dsca.mil/chapter/chapter-1#C1.3. [https://perma.cc/AHT9-5JNF]. The FMS purchaser's requests "are generally referred to as Letters of Request [("LORs")]," and may be "provided through formal correspondence, requests for proposals (RFPs), discussions, electronic mail (e-mail), letters, or messages." *Id.* § C5.1.2.; *see also id.* § C5.1.3 (requiring a memorandum if LOR is received verbally). Once an implementing agency receives an LOR and deems it complete, *see* §§ C5.1.7.1.-.1.7.2., Tables C5.T3A-B, the FMS purchaser's request is subject to an approval process that involves coordination between the DSCA, the U.S. Department of State, and the implementing agency, *see id.* § C5.4.17. If all relevant U.S. government stakeholders approve of the sale, the implementing agency and the DSCA develop a Letter of Offer and Acceptance ("LOA"), which is sent to the FMS purchaser. *See id.* Implementation of the LOA occurs once "an authorized representative of the [FMS purchaser] signs the LOA, any required initial deposit has been received by [the Defense Finance and Accounting Service] and deposited, and any required data system implementing transactions have occurred." *Id.* § C5.4.20. Once implemented, the signed LOA, including amendments and modifications, acts as the legal instrument formalizing the FMS sale and is recognized as "a government-to-government agreement between the purchaser government . . . and the United States." *Id.*; *see id.* § C5.4.1.; DFARS 225.7301(a).

"Acquisition for [FMS] purchasers [under an executed LOA] must be in accordance with DoD regulations and other applicable [U.S. government] procedures," including applicable Federal Acquisition Regulation ("FAR") and DFARS clauses. DSCA, SAMM § C6.3.1. (2012), https://samm.dsca.mil/chapter/chapter-6#C6.3.1. [https://perma.cc/VA4C-F6NW]; *see* DFARS 225.7301(b). Additionally, consistent with CICA, 10 U.S.C. § 3201(a)(1), the SAMM requires that a "competitive procurement process [be] used to the maximum extent possible when procuring articles or services." SAMM § C6.3.4. Nonetheless, the SAMM recognizes that "[a]n authorized official of the purchasing government may submit a written request . . . that the [i]mplementing [a]gency [] with procurement responsibility for the required item and/or service

3

procure a defense article(s) and/or service(s) from a specific organization or entity" and further instructs that, in such instances, "the FMS [purchaser] need not provide a rationale for the request." *Id.* The SAMM states that "the contracting activity can consider FMS purchaser requests for [a] procurement using other than full and open competition" under the international agreement exception to CICA. *Id.* The international agreement exception to CICA permits agencies to use other than full and open competition where

> the terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures[.]

10 U.S.C. § 3204(a)(4); *see* FAR 6.302-4(a)(2); DFARS 206.302-4. With respect to invoking the international agreement exception, the SAMM states:

> Requests for other than full and open competition using the authority of 10 U.S.C. 3204(a)(4) should be to meet the objective requirements of the purchaser and not for improper or unethical considerations. [U.S. government] representatives must remain objective in providing options or recommendations to the partner and may not solicit requests for other than full and open competition. In general, the [U.S. government] does not investigate the circumstances behind a foreign purchaser's request to use other than full and open competition, and DoD contracting agencies are encouraged to defer to a foreign purchaser's requests under the [i]nternational [a]greement exception to the extent that they are not aware of any indication that such requests violate U.S. law or ethical business practices. The [implementing agency] must consult with its counsel on cases where facts indicate that granting a request to use other than full and open competition may violate U.S. law or ethical business practices. If the [implementing agency] determines that a request to use other than full and open competition should not be approved, the memorandum informing the purchaser must be coordinated with DSCA.

SAMM § C6.3.4.3.

Under an executed LOA, "the purchasing activities of defense components and prime contractors implement FMS requirements using normal procurement and contract management procedures in accordance with the FAR and other directives and contractual provisions." SAMM § 6.3.5. "The degree of participation of the FMS purchaser during contract negotiations is left to the discretion of the contracting officer after consultation with the contractor." *Id.* § 6.3.5.2. Further, the implementing agency "do[es] not accept directions from the FMS purchaser as to source selection decisions or contract terms," except that the implementing agency "may honor

an FMS purchaser's sole source request for the designation of a particular prime or subcontract source for defense articles or defense services." *Id.* § 6.3.5.1.

### B.    Factual Background

The Air Force awarded Sallyport a sole source contract for the AFAB BBS services in 2014 and a follow-on sole source contract in 2022. [ECF 1] ¶ 3; AR 60.[2] These sole source awards were made under the international agreement exception to CICA based upon LORs from the Iraqi Ministry of Defense ("MoD") and executed LOAs. [ECF 39-2] ¶¶ 2-3 (CO Decl., Aug. 22, 2025). The BBS contract is funded entirely by the Iraqi government. *Id.* ¶ 2. In mid-2023, the Iraqi MoD sought to replace Sallyport as the AFAB BBS contractor. [ECF 1] ¶ 18; *see* AR 60. Sallyport alleges that "[t]he Iraqi MoD began a tender process for the follow-on BBS contract at AFAB by [] sending tenders to seven contractors, but specifically excluded Sallyport[.]" [ECF 1] ¶ 18. Sallyport maintains that, throughout this process, "the Iraqi MoD was in contact with the [Air Force Security Assistance and Cooperation Directorate ('AFSAC')]." *Id.* ¶ 19. According to Sallyport, AFSAC worked with the Iraqi MoD and the MoD's preferred vendor, Contractor A, to draft a performance work statement for the follow-on contract. *Id.*

On November 27, 2023, AFSAC sent a letter to the Iraqi MoD regarding the procurement process for the follow-on AFAB BBS contract. [ECF 1] ¶ 20; AR 378. In the letter, AFSAC acknowledged the Iraqi MoD's "desire to possibly change the BBS contractor and contract services." AR 378. AFSAC explained that, while "[i]t is possible to direct changes relatively quickly to the contract services through the current contractor; [] pursuing a new BBS provider is a long process," and that, "whether it is open competition or sole source, [the process] can take up to 2 years." *Id.* AFSAC further explained that the U.S. government "follows a well-established and regulated contract award process with required actions reviewed by subject matter experts, to include defining the requirement, researching the market, developing an acquisition strategy, drafting the Request for Proposal, evaluating sources, selecting a source, and finally awarding the contract." *Id.* Based on AFSAC's "understand[ing of the Iraqi MoD's] desire . . . to request a sole source award to a different contractor[,] . . . [AFSAC] provide[d] more details on how a sole source award works" and informed the Iraqi MoD that it required an LOR requesting a follow-on contract with a new sole source contractor by December 31, 2023, or an LOR requesting a follow-on contract with Sallyport by March 15, 2024. AR 378-79.

In February 2024, the Iraqi MoD "allegedly sent another tender to the seven vendors, but not Sallyport, and requested proposals for a potential sole source." [ECF 1] ¶ 21. However, two weeks later, "the Iraqi MoD notified all the vendors that it had selected a more 'advanced' company to whom it would sole source the work." *Id.* Thereafter, the Iraqi MoD issued an LOR stating that it had "selected [Contractor A] [] as the new sole source provider." AR 138. It also requested that Sallyport's current contract be extended while the U.S. government "continue[d] to pursue a contract award with [Contractor A]." *Id.* Based on this direction, AFSAC requested a proposal from Contractor A and a plan on how it intended to fulfill the requirements for the AFAB BBS contract. AR 225. According to AFSAC, "[Contractor A's] proposal stated that [it was] teaming with an[] Iraqi entity name[d] [Subcontractor A]." *Id.*

---

[2] The Court cites to the Administrative Record filed by the government at [ECFs 33, 41, 65] as "AR ___."

On May 10, 2024, Sallyport notified AFSAC "of potential violations tainting the . . . intended sole-source award of a follow-on contract for [AFAB BBS services] . . . to [Contractor A]." AR 323. Sallyport stated that, "[i]n early 2024, a member of the Iraqi [MoD] confidentially disclosed to Sallyport that seven of its employees were working closely with . . . the owner of the host nation vendor [Subcontractor A], to have the AFAB BBS follow-on contract awarded to [Contractor A] on a sole source basis." [ECF 1] ¶ 24; AR 326. According to Sallyport, "[Subcontractor A] was once a significant subcontractor to Sallyport at AFAB," AR 326, but Sallyport "terminated its relationship with [Subcontractor A] in 2024 based on credible allegations that [Subcontractor A] [was] affiliated with various Iranian-backed militias in Iraq," [ECF 1] ¶ 24; *see* AR 326. Sallyport also alleged that the owner of Subcontractor A, Owner A, was "business partners" with the Deputy General Secretary of the Iraqi MoD, and that the "General . . . has been one of the driving forces, along with the Minister of Defense, behind the [Iraqi] MoD's push to replace Sallyport as the prime AFAB BBS contractor." [ECF 1] ¶ 25. Sallyport further stated that it "ha[d] confirmed through . . . credible sources, that [Owner A] actively supports Iranian-backed militias and uses [Subcontractor A]'s . . . contract profits" to do so. *Id.* ¶ 26; *see* AR 326.

"On May 16, 2024, [AFSAC] notified Sallyport that it needed to submit a Withdrawal Plan detailing how Sallyport plan[ned] to ramp-down support towards the end of the contract and fully withdraw contractual support." [ECF 1] ¶ 22 (internal quotation marks omitted). Sallyport sent AFSAC a follow-up letter on May 23, 2024, requesting "information and guidance on next steps because the sole-source award to [Contractor A] appeared to be moving forward despite Sallyport's letter providing credible reports of a bribery and kickback scheme related to [the Iraqi] MoD's selection of [Contractor A]." *Id.* ¶ 30. Sallyport sent AFSAC another letter on September 20, 2024, "disclos[ing] other instances of corruption associated with AFAB." *Id.* ¶ 31. On October 2, 2024, Sallyport sent AFSAC yet another letter requesting "[U.S. Central Command] Vendor Threat Mitigation vetting for subcontractors at AFAB." *Id.* ¶ 32. This third letter was specifically in response to Sallyport's receiving information about an "approved vendor having ties to Iranian-backed militia, paying funds it receives from its subcontract to that militia, and paying bribes to steer the follow-on AFAB BBS contract to [Contractor A]." *Id.*

On January 31, 2025, after an investigation "found the Director of Subcontractor A to be a threat to force protection, AFSAC determined that "no [vendor threat] mitigation plan [could] be conducted by Subcontractor A" and stated that "Subcontractor A should not be contracted or allowed to be subcontracted for any services provided to the [U.S. government] in Iraq." AR 225, 322. Based on these findings, the contracting officer for the AFAB BBS contract determined that "Subcontractor A is not a responsible subcontractor" for the AFAB BBS follow-on contract. AR 223, 320. Shortly thereafter, on February 5, 2025, Contractor A withdrew its proposal because it depended on Subcontractor A to perform a significant portion of the BBS requirements. AR 1592. On February 13, 2025, AFSAC notified the Iraqi MoD of Contractor A's withdrawal. AR 175. In its notice, AFSAC stated that, "[i]n order to move forward and continue efforts to transition from Sallyport, we need a new [LOR] from the Government of Iraq [] as soon as possible" and that "[t]he LOR should identify a new sole source provider or request the US government conduct an open competition." *Id.* AFSAC explained that "[t]he sole source process is much faster than an open competition which typically takes a minimum of 2 years"

6

and that AFSAC "can work with the Office of Security Cooperation-Iraq [('OSC-I')] to develop an LOR which meets [Iraq's] mission needs." *Id.*

On February 26, 2025, the Iraqi MoD issued an LOR requesting that Vectrus "be selected as the [s]ole [s]ource provider for the follow-on BBS contract as soon as possible." AR 176, 178. On February 27, 2025, the Iraqi MoD issued an LOR requesting the removal of Contractor A as the sole source provider and requesting an extension of Sallyport's period of performance to January 3, 2026. AR 25. On the same day, the Air Force contacted Vectrus and requested a draft performance work statement and proposal. AR 204-06. The Air Force also inquired into whether Vectrus planned to use subcontractors and the names of the subcontractors, if any. AR 204. In response, Vectrus provided a prospective subcontractor list that included Subcontractor A and Subcontractor A affiliates. *See* AR 203. Thereafter, the Air Force informed Vectrus that Subcontractor A had been "determined to be a non-responsible subcontractor . . . and therefore not eligible for a subcontract award in support of the Iraq BBS requirement." AR 199-200. In response, Vectrus stated that it would "not use [Subcontractor A]," AR 199, and provided updated subcontractor lists, AR 881, 1174-75. Among the newly listed subcontractors was Subcontractor B. AR 881, 1174-75. AFSAC and Vectrus discussed the grounds for Subcontractor A's non-responsibility determination [* * *]. AR 615.

On May 8, 2025, Sallyport sent a letter notifying AFSAC and OSC-I of Owner A's alleged involvement with the intended sole source award to Vectrus. AR 1547-48. Sallyport stated that it was "continuing to obtain intelligence and evidence of the alleged involvement of [Owner A] as well as other information indicating that [the Iraqi] MoD's latest sole-source selection appears again to be tainted by conduct that would violate United States laws and regulations." AR 1548. Sallyport also advised that "the best way to mitigate improper motivations behind a sole source selection of a contractor at [AFAB] is for AFSAC to conduct the selection of a new contractor according to full and open competition." *Id.* Shortly thereafter, on May 13, 2025, Sallyport provided an additional letter including evidence of potential violations of U.S. law and regulations by Owner A. *See* AR 1553-55.

On May 22, 2025, AFSAC executed an LOA with the Iraqi MoD identifying Vectrus as the sole source provider for the follow-on AFAB BBS contract. AR 502-04. The Air Force then completed an "International Agreement Competitive Restrictions" memorandum, which justified the use of the international agreement exception to full and open competition under CICA and FAR 6.302-4. AR 508-10. Prior to the LOA identifying Vectrus as the sole source provider, the U.S. government offered the Iraqi MoD an LOA, which would have extended Sallyport's contract period of performance through December 31, 2025. AR 511, 593; [ECF 1] ¶ 34. However, the Iraqi MoD declined to implement the LOA granting such extension, and Sallyport's contract expiration remained July 31, 2025. AR 511, 593; [ECF 1] ¶ 34.

On June 17, 2025, Sallyport sent AFSAC another letter, alleging that "[Owner A] and . . . [Subcontractor A] were positioning themselves to be part of [Vectrus's] transition team and were at the center of a scheme where 50% of all subcontract work would go to [Subcontractor A] and the other 50% would go to vendors on an Iraqi MoD approved list who had agreed to pay kickbacks to MoD officials." [ECF 1] ¶ 37; *see id.* ¶¶ 40, 41. According to Sallyport, "[Subcontractor A] and [Owner A] have been included in transition-related activities at AFAB,"

such as attending meetings between Vectrus and the Iraqi MoD. *Id.* ¶ 38. In addition, Sallyport stated that two of its former employees, who now have ties with Subcontractor A and Owner A, "were recently seen by Sallyport personnel at [AFAB] engaging in [Vectrus] related transition activities." *Id.* Sallyport requested that "AFSAC inform Sallyport no later than June 23, 2025[,] of its intent to investigate the potential violations." *Id.* ¶ 43 (internal quotation marks omitted).

On June 25, 2025, Sallyport sent another letter to AFSAC. [ECF 1] ¶ 44; AR 1565-66. This letter included "additional information about [Owner A]'s connections to, and support of, various Iranian-backed militias," asked for the Air Force's acknowledgement of receipt, and "requested information about the status of the intended sole source AFAB BBS contract, and any actions AFSAC ha[d], or intend[ed] to take, in response to the issues raised by Sallyport." [ECF 1] ¶ 44; *see* AR 1567-89. AFSAC responded by email on the same day, confirming receipt of both the June 17th and June 25th letters and stating that the letters "have been . . . or will be . . . coordinate[d] with the appropriate security personnel." [ECF 1] ¶ 45. The Air Force entered the AFAB BBS contract with Vectrus on June 25, 2025. AR 1276. According to Sallyport, it learned of the award to Vectrus from a DoD website on the following day. [ECF 1] ¶ 46.

### C.    Procedural History

Sallyport filed its complaint on July 3, 2025. [ECF 1]. It seeks a declaratory judgment that the Air Force's decision to proceed with a sole source award to Vectrus is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *Id.* at 26.[3] Sallyport also seeks a permanent injunction prohibiting the Air Force "from authorizing performance under the improper sole source contract" and "from awarding a[n] AFAB BBS contract on a sole source basis at the direction of the Iraqi MoD." *Id.* After an initial status conference on July 9, 2025, *see* [ECF 11], the Court issued a scheduling order on July 17, 2025, [ECF 26], which was amended on July 25, 2025, [ECF 32]. Pursuant to the amended scheduling order, the government filed the administrative record on July 31, 2025. [ECF 33]. Thereafter, Sallyport filed a motion to complete the record, [ECF 34], to which the government filed a response, [ECF 39]. However, following a status conference on August 27, 2025, *see* [ECF 38], the parties agreed on the contents of the administrative record, and the Court issued a revised briefing schedule, [ECF 40]. On September 12, 2025, the government filed corrections and an addendum to the administrative record. [ECF 41].

On September 17, 2025, Sallyport filed its motion for judgment on the administrative record. Pl.'s Mot. J. Admin. R. [ECF 44]. In its motion, Sallyport argues that the Air Force's sole source award to Vectrus violated CICA, as implemented through the SAMM; violated the Never Contract with the Enemy Act ("NCWE Act");[4] and violated FAR Subpart 9.1. [ECF 44-2] at 10. On December 5, 2025, following an unopposed amendment to the briefing schedule, [ECF 48], and a stay in the case due to a lapse in appropriations, *see* [ECF 50], the government filed its

---

[3] All page numbers cited from the filings on the docket refer to the page numbers generated by the CM/ECF system.

[4] Never Contract with the Enemy Act, Carl Levin & Howard P. "Buck" McKeon National Defense Authorization Act ("NDAA") for Fiscal Year ("FY") 2015, Pub. L. No. 113-291, §§ 841-43, 111 Stat. 3292, 3450-57 (2014) [hereinafter FY 2015 NDAA].

motion to dismiss, cross-motion for judgment on the administrative record, and response to Sallyport's motion, Def.'s Mot. to Dismiss, Cross-Mot., & Resp. [ECF 55]. On the same day, Vectrus filed its motion to dismiss, cross-motion for judgment on the administrative record, and response to Sallyport's motion. Def.-Intervenor's Mot. to Dismiss, Cross-Mot., & Resp. [ECF 54]. The parties' respective motions are fully briefed, *see* Pl.'s Reply & Resp [ECF 61]; Def.'s Reply [ECF 62]; Def.-Intervenor's Reply [ECF 63], and the Court held oral argument on January 14, 2026, *see* [ECF 56].[5]

## II.    Motions to Dismiss for Lack of Standing

In its motion to dismiss, the government contends that Sallyport lacks Article III standing. *See* [ECF 55] at 18-26. Specifically, the government asserts that Sallyport's claims "challenge the LOA," *id.* at 20, and that "this Court may not consider any challenges to the LOA because they arise from a treaty over which this Court lacks jurisdiction," *id.* The government also argues that "Sallyport's protest [] presents a nonjusticiable political question that this Court should abstain from adjudicating," *id.* at 21. According to the government, "Sallyport asks the Court to set aside Iraq's LOA for a sole-source procurement, and [] require the award to be made on a competitive basis." *Id.* at 24. The government argues that, because this relief would exceed the Court's authority, "there is no remedy that this Court can provide Sallyport consistent with its jurisdictional limits." *Id.*; *see also id.* at 25 (stating that this Court "does not have the power to order an agency to alter the terms of an LOA or to inquire into a foreign nation's reasons for an LOR or its terms").

Vectrus argues that "Sallyport does not have Tucker Act or Article III standing to bring this protest." [ECF 54-1] at 23. Vectrus states that "Sallyport seeks relief the Court cannot grant—to order the Air Force to ignore international agreements and [CICA][.]" [ECF 54-1] at 9. Vectrus asserts that it is the Iraqi MoD's actions, rather than the Air Force's actions, that caused the alleged injury to Sallyport and that, therefore, Sallyport lacks Article III standing because its alleged injury will not be remedied by the relief it seeks. *Id.* at 27. According to Vectrus, "Sallyport lacks Tucker Act standing because it is neither an interested party nor prejudiced by any significant error." *Id.* at 24 (emphasis omitted).[6]

---

[5] On January 9, 2026, Vectrus moved to supplement its cross-motion for judgment on the administrative record, seeking to include the results of an investigation by the Iraqi MoD on the grounds that "[such] documentation directly relates to the issue of Sallyport's standing and the Court's subject matter jurisdiction." Def.-Intervenor's Mot. [ECF 66] at 2. On January 21, 2026, Sallyport responded to Vectrus's motion, arguing that it was "procedurally deficient," that Vectrus's arguments were "contrary to the [United States Court of Appeals for the] Federal Circuit's standing inquiry," and that "the information proffered by Vectrus [was] of questionable authenticity, relevance, and credibility." Pl.'s Resp. [ECF 67] at 2. Vectrus replied on January 28, 2026. Def.-Intervenor's Reply [ECF 68].

[6] Vectrus also contends that Sallyport was aware of the basis of its claims "well before the [AFAB BBS] contract [was] issued," [ECF 54-1] at 29, and that "[p]ost-award protests that raise challenges [that] a protestor was aware of before the award are untimely and subject to dismissal," *id.* (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007)). The Court finds Vectrus's argument unavailing. The Federal Circuit has held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P.*, 492 F.3d at 1313. The "*Blue & Gold* waiver rule is predicated not only on the notion of avoiding delay that could benefit the delaying party, but also on the

9

Sallyport contends that "[n]one of the plethora of procedural arguments the [g]overnment and Vectrus conjure allows them to escape review of the merits[.]" [ECF 61] at 11. Sallyport posits that "[i]mplementing agencies are not required to unquestionably accept a foreign government's demand for a sole source contract," *id.* at 17, and that "[i]f a foreign government demands something that is contrary to U.S. law, the agency . . . must refuse the request," *id.* In Sallyport's view, it "is not asking the Court to direct Iraq to take any actions . . . it is asking the Court to decide whether the Air Force violated the law by awarding a sole source contract to Vectrus, and, if so, to require the Air Force to follow the law." *Id.* at 18 (emphasis omitted). Sallyport further explains that its claims "are limited to whether the Air Force has complied with federal procurement law when negotiating and awarding a contract for BBS services to Vectrus," *id.* at 15, and that "[t]he [AECA], federal procurement regulations, and this Court's precedent all confirm these are not political issues," *id.* According to Sallyport, its requested relief is "well within the Court's power under the Tucker Act," *id.* at 16, and "if the [g]overnment had properly held a lawful full and open competition, . . . Sallyport had at least a substantial chance at prevailing," *id.* at 13.

### A.    Sallyport has Article III Standing

Article III standing relates to a court's authority to adjudicate claims and "implicat[es] dismissal under RCFC 12(b)(1) or 12(h)(3)." *Associated Energy Grp., LLC v. United States*, 172 Fed. Cl. 799, 810 (2024) (citing *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1152 (Fed. Cir. 2023)). "The Court of Federal Claims, though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III," *Anderson v. United States,* 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003), and must address Article III challenges before adjudicating the claims on the merits, *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998)), *abrogated on other grounds by CACI, Inc.-Fed.*, 67 F.4th 1145. "[T]o establish [Article III] standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. United States*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (internal quotation marks omitted).

When reviewing a motion to dismiss under RCFC 12(b)(1), the "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in

---

notion of preserving challenges and providing notice to interested parties." *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 767 (Fed. Cir. 2021) (citing *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015)). Here, Sallyport preserved its challenges by notifying the Air Force of the alleged procurement violations in advance of the Air Force issuing the sole source award to Vectrus. *See* AR 1550-52, 1553-55, 1556-58, 1565-66 (Sallyport's letters notifying the Air Force of potential violations related to the AFAB BBS contract); *see also Harmonia Holdings Grp., LLC,* 20 F.4th at 767 (finding *Blue & Gold* waiver inapplicable when the protester files a timely, formal challenge with the agency); *SEKRI, Inc. v. United States*, 34 F.4th 1063, 1074 (Fed. Cir. 2022) (finding that a bidder did not waive its claims where the agency proceeded with the procurement despite notice of the alleged violation).

favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). If, however, the defendant challenges the factual basis of the court's jurisdiction, disputed allegations in the complaint are not controlling, *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed. Cir. 1993), and the Court may look to relevant evidence to determine the existence of jurisdiction, *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). "The party invoking federal jurisdiction bears the burden of establishing" its jurisdiction. *Lujan*, 504 U.S. at 561. Further, the plaintiff's Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citations omitted). If the court determines that a plaintiff lacks standing, then the court lacks jurisdiction and must dismiss the case. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); RCFC 12(h)(3); *see Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1354 (Fed. Cir. 2018).

Here, the Court finds that Sallyport has Article III standing to bring its claims. Sallyport alleges that "the [Air Force's] decision to proceed with the sole source award requested by the Iraqi MoD, despite [] indications of violation of U.S. law and ethical business practices[,] was arbitrary, capricious, an abuse of discretion, and in violation of the law." [ECF 1] ¶ 59. Specifically, Sallyport contends that, "[b]y proceeding with the sole source AFAB BBS follow on contract without adequately addressing the allegations of fraud and corruption tainting the Iraqi MoD's sole source decision," *id.*, the Air Force violated the SAMM, *id.*; the NCWE Act and its implementing regulations, *id.* ¶¶ 51-52; and the FAR, *id.* ¶¶ 55, 58. According to Sallyport, if not for the Air Force's irrational decision not to investigate the allegations of fraud and corruption, Sallyport would have continued to perform under its AFAB BBS contract until a proper full and open competitive process could be conducted. *Id.* ¶ 15. Sallyport also alleges that "a full and open competition is the only procurement process that will avoid the taint of fraud and corruption that motivated the decision by the [Iraqi MoD] to issue a sole source award." *Id.* Based on these allegations, the Court finds that Sallyport has established that it suffered an actual injury—the loss of its ability to compete for the follow-on AFAB BBS contract. Sallyport has also established that its injury was caused by the Air Force—namely, the Air Force's allegedly irrational decision to accept the Iraqi MoD's request for a sole source procurement and the Air Force's alleged violation of law in making the sole source award to Vectrus. Lastly, if Sallyport were to succeed on the merits of its claims, the Court could grant relief capable of redressing its injury. For example, the Court could, among other things, set aside the sole source contract awarded to Vectrus. *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (indicating that the Court can set aside a sole source contract award under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706).

The Court does not agree with the government that Sallyport's claims present nonjusticiable political questions. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). "While the political question doctrine renders many executive decisions over defense and foreign policy outside the province of the courts," *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 116 (2011), "it is error to suppose that every case or controversy which touches foreign relations lies

11

beyond judicial cognizance," *Baker v. Carr*, 369 U.S. 186, 211 (1962). "[W]here executive conduct is regulated by federal statute or regulation—in any sphere—and the courts are presented with an appropriate controversy, the Constitution requires the courts to take jurisdiction and apply the law." *Def. Tech., Inc.*, 99 Fed. Cl. at 116 (citing *Clinton v. Jones*, 520 U.S. 681, 703 (1997)). "Moreover, it is well established that the [APA] . . . and the FAR apply to and govern bid protests against [DoD] procurements . . . [and] no court has questioned the constitutionality of judicial oversight of federal defense procurements." *Id.* at 117 (citations omitted).

Sallyport's claims fall within the Court's authority to adjudicate because the Air Force's conduct is governed by statutes, regulations, and guidelines that are subject to interpretation and application to the facts of this case. While the Court acknowledges "the premier role which both Congress and the Executive play" in the field of foreign relations, *id.*, the decision to accept the Iraqi MoD's request for a sole source procurement is subject to judicial review because procurements under the FMS program are subject to United States procurement law, *see* DFARS 225.7301(a)-(b); SAMM § 6.3.5; *Vectrus Servs. A/S v. United States,* 164 Fed. Cl. 693, 757 (2023) ("When a claim is based on a statutory right, '[t]he federal courts are not being asked to supplant a foreign policy decision of the political branches,' but rather to 'enforce a specific statutory right,' which 'is a familiar judicial exercise.'" (alteration in *Vectrus Servs. A/S*) (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012))); *see also L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 293 (2011) (considering whether an Air Force decision "was arbitrary when viewed in the context of the SAMM procedures"); *Hyperion, Inc. v. United States*, 120 Fed. Cl. 504, 514 (2015) (holding that the Army adhered to the SAMM requirements in cancelling a solicitation). In this case, the Court is solely reviewing the Air Force's compliance with applicable law, regulations, and agency guidelines—not any "policy choices or value determinations" made by Congress or the Executive. *Japan Whaling Ass'n*, 478 U.S. at 230.[7] As a result, Sallyport's claims do not present nonjusticiable political questions.[8]

### B.    Sallyport has Tucker Act Standing

---

[7] While invalidating Vectrus's contract "may have significant political overtones" and interfere with the Air Force's ability to comply with the LOA, this does not mean that the Court should "shirk [its] responsibility" to perform the judiciary's "characteristic roles." *Japan Whaling Ass'n*, 478 U.S. at 230. To the extent the Court's decision could impact national security or foreign relations, the Court may consider such impacts when crafting injunctive relief. *See Advanced Tech. Sys. Co.*, 174 Fed. Cl. 144, 161 (2024) (concluding that "national security concerns underlying this case weigh against the court granting injunctive relief").

[8] The government also contends that Sallyport's claims are barred by treaty preclusion under 28 U.S.C. § 1502. [ECF 55] at 20. To be barred by treaty preclusion under § 1502, the question is "whether plaintiff's claim could conceivably exist independently of, or separate and apart from, the subject treaty, or whether, on the contrary, it derives its existence so exclusively and substantially from certain express terms or provisions thereof, that consideration of the claim would necessitate our construction of the treaty itself." *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 903 (Ct. Cl. 1976); *see also id.* n.17 (indicating that LOAs are considered treaties for purposes of 28 U.S.C. § 1502). Because Sallyport's claims exist independently of the LOA and derive their existence from the Air Force's compliance with applicable statutes, regulations, and guidelines governing federal government procurement, they are not barred by 28 U.S.C. § 1502. *See Vectrus Servs. A/S*, 164 Fed. Cl. at 747 ("[I]f there is a statute, contract, or other basis for the cause of action asserted against the United States, the claim will be considered 'independent' of a treaty[.]" (citations omitted)).

In contrast to constitutional Article III standing, statutory Tucker Act standing is not jurisdictional and is instead addressed under RCFC 12(b)(6). *Associated Energy Grp., LLC*, 172 Fed. Cl. at 810 (citing *CACI, Inc.-Fed.*, 67 F.4th at 1152). Statutory standing in bid protests "is framed by [the Tucker Act,] 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III." *Savantage Fin. Servs., Inc. v. United States*, 123 Fed. Cl. 7, 29 (2015) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (internal quotation marks omitted)). In ruling on a motion to dismiss under RCFC 12(b)(6), courts "must accept as true all the factual allegations in the complaint . . . [and] must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). "A trial court should not dismiss a complaint for failure to state a claim [pursuant to RCFC 12(b)(6)] unless it is 'beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.'" *Id.* (quoting *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed. Cir. 1989)). "Assertions of legal conclusions are not credited during this assessment, and the complaint must include nonconclusory factual allegations setting forth a plausible–as opposed to merely a conceivable–claim for relief." *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 287 (2025) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009)). A bid protest brought by a plaintiff without Tucker Act standing must be dismissed under RCFC 12(b)(6) for failure to state a claim. *Monbo v. United States*, 175 Fed. Cl. 440, 451 (2025).

To establish Tucker Act standing, a "party first must show that it is an 'interested party' . . . [specifically] that it (1) is an actual or prospective bidder and (2) has a direct economic interest in the procurement or proposed procurement." *Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1319 (Fed. Cir. 2025) (quoting *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017)). "To prove a direct economic interest, a party must show that it had a substantial chance of winning the contract." *Diaz*, 853 F.3d at 1358 (quoting *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)). "Second, [a] [party] must show that it was prejudiced by a significant error in the procurement process." *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (quoting *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018)). While the requirements of "direct economic interest" and "prejudice" are distinct, prejudice may be shown "as part of . . . showing a direct economic interest." *CliniComp Int'l, Inc.*, 904 F.3d at 1358 (citing *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1379-80 (Fed. Cir. 2009)). In the context of a challenge to a sole source procurement, a protester may satisfy the requirements of direct economic interest and prejudice by showing:

> (1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, . . . and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award, . . . ; or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award.

*B.H. Aircraft Co. Inc. v. United States*, 158 Fed. Cl. 750, 764 (2022) (quoting *Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086), *aff'd*, 89 F.4th 1360 (Fed. Cir. 2024); *see also CliniComp Int'l, Inc.*, 904 F.3d at 1360 (stating that where a protester "claims prejudice from the government's

13

alleged error of awarding [a] contract on a sole-source basis," the protester "must show that if the error were rectified—i.e., if the contracting process were made competitive—[the protester] could compete for the contract").

Here, the Court finds that Sallyport has Tucker Act standing to bring its claims because it plausibly alleges a set of facts which, if proven, entitles it to relief. Sallyport performed the incumbent contract as the sole source awardee from 2014 through 2025. [ECF 1] ¶ 3. In its complaint, Sallyport states that it received "consistently positive Contractor Performance Assessment Reports . . . [,] achieved significant cost savings, fostered good relationships with Iraqi leadership, and worked collaboratively with [the Iraqi Air Force]." *Id.* ¶ 4. Sallyport also alleges that there was evidence of a bribery, kickback, and pay-to-play scheme involving Owner A with respect to the AFAB BBS follow-on contract, *id.* ¶¶ 29, 36-37, and that Owner A has ties to Iranian-backed militias and sought to steer the sole source awardee's subcontract work to his affiliated entities, *id.* ¶¶ 26, 31-32, 37-38, 40. Further, Sallyport alleges that the Air Force awarded Vectrus the AFAB BBS contract "without adequately investigating [Owner A]'s and [Subcontractor A]'s role on the AFAB BBS transition and sole source award to [Vectrus]." *Id.* ¶ 50. According to Sallyport, such actions by the Air Force violated the SAMM, the FAR, and the NCWE Act. *Id.* ¶¶ 51, 55, 58; *see* [ECF 44-2] at 34-36. Sallyport contends that, if the Air Force had followed the applicable procedures, it would have conducted "a proper full and open competitive process . . . to award the follow-on contract" because "a full and open competition is the only procurement process that will avoid the taint of fraud and corruption that motivated the [Iraqi MoD's] decision . . . to issue a sole source award." [ECF 1] ¶ 15.

These allegations plausibly demonstrate that Sallyport is an interested party that was prejudiced by the Air Force's actions. Sallyport is a prospective bidder because its performance of the incumbent contract shows that it can perform the follow-on AFAB BBS contract. Sallyport also satisfies the direct economic interest and prejudice requirements because, if the Air Force had proceeded without the alleged violations, its decision to make a sole source award to Vectrus rather than to conduct a competitive procurement process would have been irrational. Additionally, in a competitive procurement, Sallyport would have had a substantial chance of receiving the award. In other words, it is plausible that, if the Air Force had complied with its obligations under the SAMM, the FAR, and the NCWE Act—and properly investigated the allegations of fraud and corruption affecting the AFAB BBS follow-on contract—it would not have awarded a sole source contract to Vectrus and would have determined that the only means of conducting the procurement in compliance with law would be through a competitive procurement. In a competitive procurement, Sallyport would have had a substantial chance of receiving the contract due to its prior experience and achievements as the incumbent contractor.

## III.    Cross-Motions for Judgment on the Administrative Record

The Court next considers the parties' cross-motions for judgment on the administrative record. Under RCFC 52.1, "a party may file a motion for judgment on the administrative record for the Court to assess whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review." *Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 17 (2019) (citing *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013)), *aff'd*, 959 F.3d 1379 (Fed. Cir. 2020). Such a

14

motion "allow[s] fact-finding by the trial court . . . [and] provide[s] for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). In evaluating such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 661 (2010) (citing *Bannum, Inc.*, 404 F.3d at 1356-57).

Challenges to an agency's actions in a bid protest are adjudicated under the APA standard of review, which permits a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 559 (2012) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013). "This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285 (1974)). However, while "[p]rocurement decisions are subject to a 'highly deferential rational basis review,'" *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021) (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure," *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334-35 (Fed. Cir. 2001), *superseded by statute*, Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, *as recognized in Percipient.AI, Inc. v. United States*, 153 F.4th 1226, 1233-34 (Fed. Cir. 2025)).

"[I]f the [] court finds that the government's conduct fails the APA review . . . then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 120 (2022) (citations omitted), *aff'd*, No. 2022-1949, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023). "When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award." *Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086 (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). A disappointed party challenging a sole source award can establish prejudice by showing that "proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, . . . and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award[.]" *Id.* (citations omitted); *see also Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1382 n.2 (Fed. Cir. 2024) (stating that in evaluating prejudice at the standing stage, the court "must presume that the party will, if permitted to proceed with its claim, prevail on the merits," but that at the merits stage, "[t]he party is no longer accorded this presumption" and the court "must review[ ]

15

evidence of prejudice on the merits," which "gives rise to the possibility that a party will demonstrate prejudice for purposes of standing but fail to do so on the merits" (second alteration in original) (internal quotation marks and citations omitted)).

In its motion for judgment on the administrative record, Sallyport argues that the Air Force's sole source award to Vectrus violated the SAMM requirements that implement the international agreement exception to CICA, [ECF 44-2] at 25-29, that the Air Force irrationally failed to consider Vectrus's proposed subcontractors when making a responsibility determination of Vectrus under FAR Subpart 9.1, *id.* at 34-37, and that the Air Force violated the NCWE Act, *id.* at 29-34. As explained below, the Court finds that Sallyport fails to establish a violation of the SAMM and FAR Subpart 9.1, and fails to demonstrate a prejudicial violation of the NCWE Act.

## A.      Sallyport Fails to Establish a Violation of the SAMM

Sallyport argues that "the Air Force's sole-source award to [Vectrus] violated CICA, including the SAMM requirements that implement the International Agreement exception." [ECF 44-2] at 25 (capitalization and emphasis omitted). Sallyport contends that "the Air Force had credible evidence that the Iraqi [MoD's] request to use other than competitive procedures was motivated by improper or unethical considerations," *id.* at 27, and that "there is no evidence that the Air Force followed the SAMM's direction to consult with counsel and consider denying the [] request from the Iraqi [MoD] to use other than competitive procedures to award a sole source contract to [Vectrus]," *id.* According to Sallyport, such actions by the Air Force indicate that it "failed to comply with the mandatory requirements set forth in the SAMM," *id.* at 28, which "are prerequisites to invoking CICA's International Agreement exception to full and open competition," *id.* at 28-29. Sallyport therefore contends that it was prejudiced by the Air Force's actions because if the Air Force had "appropriately followed the SAMM, it would have declined the Iraqi [MoD's] request for a sole source award to [Vectrus and] would have had no basis to avoid procuring [the AFAB BBS] services [through] a full and open competition." *Id.* at 29.[9]

In response, the government states that "at most, the 'policy requirements' of [SAMM] § C.6.3.4.3 trigger a duty by the agency to 'consult with its counsel' on cases where the facts indicate that granting a sole source request would violate U.S. law or ethical business practices,"

---

[9] Sallyport also alleges that the Air Force improperly "solicited the request to sole source the award" from Iraq rather than hold a full and open competition. [ECF 44-2] at 25. Sallyport contends that the SAMM "prohibits any [U.S. government] representatives from 'solicit[ing] requests for other than full and open competition,'" *id.* at 26 (second alteration by Sallyport) (quoting SAMM § C.6.3.4.3.), and that the Air Force's communications with Iraq solicited a request for a sole source procurement, *id.* at 27 (citing AR 175). The Court is unpersuaded. The SAMM provides that "[U.S. government] representatives must remain objective in providing options or recommendations to the partner and may not solicit requests for other than full and open competition." SAMM ¶ C6.3.4.3. Here, while the Air Force explained to the Iraqi MoD that "[t]he sole source process is much faster than an open competition which typically takes a minimum of 2 years," AR 175, the Air Force did not solicit a request for other than full and open competition. Rather, the Air Force's communications with the Iraqi MoD reflect an objective assessment of the procurement options and timelines in relation to the Iraqi MoD's mission needs. *See, i.e.,* AR 175 ("The LOR should identify a new sole source provider or request the US government conduct an open competition . . . . [T]he Air Force can work with the Office of Security Cooperation-Iraq (OSC-I) to develop an LOR which meets your mission needs."); AR 378 ("The process to award a new contract to a new vendor, whether it is open competition or sole source, can take up to 2 years from start (decision) to finish (award)."); AR 379 (noting that a sole source award to the current vendor provides a "less immediate" timeline than a sole source award to a new vendor).

[ECF 55] at 31, and that § C.6.3.4.3's requirements "are not . . . prerequisites to invoking CICA's International Agreement exception," *id.* (internal quotation marks omitted). Vectrus, in turn, adds that the "credible evidence" Sallyport provided to the Air Force is "nothing but suspicion and innuendo," [ECF 54-1] at 41 (internal quotation marks omitted), and that "[t]he record reflects [that] neither Sallyport nor the Air Force were aware of actionable indications of violations of U.S. law or regulation," *id.* at 43. Vectrus further states that "[t]he Air Force took the appropriate action based on the actionable facts in front of it," *id.* at 42, and that "[r]egardless, the record shows the Air Force did try to explore Sallyport's vague accusations," *id.* Moreover, in response to Sallyport's allegation that the Air Force failed to consult with legal counsel, Vectrus states that "there is no such obligation, and in any event, the record demonstrates legal counsel was involved throughout." *Id.* at 43.

As discussed above, the international agreement exception to CICA permits the use of a sole source procurement rather than full and open competition where "the terms of an international agreement . . . between the United States and a foreign government . . . or the written directions of a foreign government reimbursing the agency for the cost of the procurement . . . for such government, have the effect of requiring the use of procedures other than competitive procedures." 10 U.S.C. § 3204(a)(4). SAMM § C6.3.4 provides that "the purchasing government may submit a written request . . . that the Implementing Agency . . . procure a defense article(s) and/or service(s) from a specific organization or entity." The SAMM further provides that requests for a sole source procurement using the international agreement exception "should be to meet the objective requirements of the purchaser and not for improper or unethical considerations." SAMM § C6.3.4.3. The SAMM instructs that "[i]n general, the [U.S. government] does not investigate the circumstances behind a foreign purchaser's request" for a sole source procurement, and that DoD agencies "are encouraged to defer" to the foreign purchaser's sole source request "to the extent that they are not aware of any indication that such requests violate U.S. law or ethical business practices." *Id.* The SAMM states that the implementing agency "*must consult with its counsel* on cases where facts indicate that granting a request to use other than full and open competition may violate U.S. law or ethical business practices." *Id.* (emphasis added). It also directs that, if the implementing agency determines that a sole source request "should not be approved," the U.S. government must notify the foreign purchaser. *Id.*

Here, the record shows that the Air Force satisfied its obligations under the SAMM in approving the Iraqi MoD's request for a sole source procurement and invoking the international agreement exception to CICA. The Air Force received an LOR from the Iraqi MoD requesting a sole source award to Contractor A in February 2024. *See* AR 27, 58, 138. On May 10, 2024, Sallyport notified the Air Force of "a potential bribery and kickback scheme involving Iraqi government officials" and Contractor A's subcontractor, Subcontractor A, AR 226, "to have the AFAB BBS follow-on contract awarded to [Contractor A] on a sole source basis," AR 229. *See also* AR 294 (Sallyport's May 23, 2024, letter to AFSAC reiterating "concerns about potential corruption tainting the intended sole source award of the AFAB BBS follow-on contract to [Contractor A]"). By June 10, 2024, the Air Force assigned a fraud attorney from the Air Force Materiel Command Law Office ("AFMCLO") to "handl[e] the fraud allegation that w[as] presented by Sallyport against [Subcontractor A]." AR 1590. A [* * *] security specialist "explained to [the AFMCLO fraud attorney] what [the] concern[s] were with [Subcontractor

17

A]," *id.*, and the AFMCLO fraud attorney presented the concerns to "the [Air Force Office of Special Investigations ('OSI')] [* * *]," *id.* at 1590-91. According to the security specialist, the AFMCLO fraud attorney "stated that the fraud allegations Sallyport presented were [] being evaluated by OSI to see if there was enough information to open an investigation," *id.*, and that "[w]hen OSI begins the investigation [the attorney] plans to link up the AFSAC [* * *], OSI [* * *], the [vendor threat] mitigation cell, and the [* * *] security specialist so [they] can all stay in the loop," AR 1591. Thereafter, the AFMCLO fraud attorney continued to be involved in the review of the Iraqi MoD's requested sole source award to Contractor A. *See* AR 1528-29 (AFMCLO acquisitions attorney email indicating that Sallyport's September 20, 2024, letter was sent to the AFMCLO fraud attorney);[10] AR 1539-43 (email copying the AFMCLO fraud attorney on an email chain regarding AFAB BBS procurement issues). On January 31, 2025, the Air Force contracting officer determined that Subcontractor A "is not a responsible subcontractor," AR 223, based on a meeting with the security specialist "to review and discuss [the] investigative agency's findings for [Subcontractor A] and discuss[ion] [] *with legal counsel*," AR 222 (emphasis added).

After Contractor A withdrew its proposal on February 5, 2025, AR 1592, the Iraqi MoD issued its February 26, 2025, LOR requesting that Vectrus be the sole source provider, AR 176-78. On February 27, 2025, the Air Force contacted Vectrus to request information, including "any names of subcontractors" that Vectrus is considering. AR 181. In response, Vectrus provided a list of subcontractors, which included Subcontractor A. AR 180. After the Air Force informed Vectrus that Subcontractor A "ha[d] been determined to be a non-responsible subcontractor," AR 209, Vectrus informed the Air Force that it would not use Subcontractor A, AR 199. Thereafter, Sallyport notified the Air Force of potential corruption affecting the sole source award to Vectrus and included the AFMCLO in its communications. *See* AR 1551-52 (Sallyport's May 8, 2025, letter copying the AFMCLO and alleging that Vectrus has ties to Owner A and that the Iraqi MoD's "latest sole-source selection appears again to be tainted by conduct that would violate United States laws and regulations"); AR 1555 (Sallyport's May 13, 2025, letter copying the AFMCLO and stating that Sallyport "will continue to gather additional evidence supporting the improper conduct motivating the Minister of Defense's actions, including efforts involving the selection of [Vectrus] to replace Sallyport"). On May 27, 2025, the AFMCLO approved the acquisition strategy for a sole source award to Vectrus. AR 511. The next day, the AFMCLO approved the use of the international agreement exception to CICA for the sole source award to Vectrus. AR 508. The AFMCLO attorney who provided these approvals was involved throughout the AFAB BBS procurement process. AR 55 (presentation slide showing that the acquisition strategy panel included the AFMCLO attorney); AR 1539-43 (email forwarding an email chain regarding AFAB BBS procurement issues to the AFMCLO attorney); AR 318 (email from security specialist to the AFMCLO attorney providing the contractor activity report for Subcontractor A); AR 1621-23 (email chain copying the AFMCLO attorney on communications with Subcontractor A's legal counsel); AR 1545 (email forwarding Sallyport's May 8, 2025, letter to the AFMCLO attorney).[11]

---

[10] Sallyport had copied the AFMCLO acquisitions attorney on its September 20, 2024, letter to the Air Force. AR 296-97, 1531.

[11] After the AFMCLO provided these approvals, Sallyport continued to notify the Air Force of potential corruption affecting the sole source award to Vectrus, and Sallyport included the AFMCLO in these communications. AR

This record demonstrates that the Air Force was aware of Sallyport's allegations of violations of U.S. law and ethical business practices in connection with the Iraqi MoD's request for a sole source procurement, that the Air Force notified counsel of such alleged violations, that counsel was included in Air Force communications regarding the AFAB BBS follow-on contract, and that counsel ultimately approved the sole source award to Vectrus. Under SAMM § C.6.3.4.3, the Air Force is only required to "consult with its counsel on cases where facts indicate that granting a request to use other than full and open competition may violate U.S. law or ethical business practices." The SAMM does not specify the nature or extent of such consultation, nor does it necessitate what, if any, type of documentation must result from such consultation. Although the record in this case lacks evidence of the scope and substance of the Air Force's consultation with its counsel, it demonstrates that the Air Force involved counsel throughout the AFAB BBS contract procurement process. This is sufficient evidence for the Court to conclude that the Air Force complied with SAMM § C.6.3.4.3 by "consulting" with counsel. *See Bowman Transp., Inc.*, 419 U.S. at 286 ("[The court] will uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.").

### B.    Sallyport Fails to Establish a Violation of FAR Subpart 9.1

Sallyport argues that the Air Force acted irrationally when it "award[ed] the sole source contract without first considering how [Vectrus's] proposed subcontractors affected the Air Force's responsibility determination." [ECF 44-2] at 34. Sallyport states that "on this record, any reasonable evaluation would have concluded that any team involving [Vectrus's] subcontractors could not be found responsible," *id.* at 36, because Vectrus's lead subcontractor "lacks a satisfactory record of integrity and business ethics," *id.*, and because "many of [Vectrus's other subcontractors] are nothing but shell companies stood up solely to evade the consequences of the Air Force's determination that [Subcontractor A] is non-responsible," *id.* at 37. According to Sallyport, "had the Air Force reasonably evaluated [Vectrus's] responsibility under FAR Subpart 9.1, it would have precluded the Air Force from awarding [] the sole source provider requested by the Iraqi Government," *id.*, and "the Air Force would have had no choice but to comply with CICA and use full and open competitive procedures to award the contract," *id.*

In response, the government contends that "the [Air Force's] obligation to conduct a responsibility determination extends only to the prime contractor to whom an award is made." [ECF 55] at 27. According to the government, "where the Air Force receives adverse information about a proposed subcontractor prior to award, as it did with [Subcontractor A], the Air Force is free to act on that information and consider it to the extent it may affect the [g]overnment's determination of the prospective prime contractor's responsibility . . . [b]ut there is no requirement that the [g]overnment undertake such vetting prior to award." *Id.* at 28 (internal quotation marks and citations omitted). The government states that the Air Force was not aware

---

1556, 1558 (Sallyport's June 17, 2025, letter copying the AFMCLO and stating that Sallyport "must again write . . . to disclose more corrupt practices of Iraqi officials related to the AFAB BBS contract"); AR 1565-66 (Sallyport's June 25, 2025, letter directed to the AFMCLO, stating that Sallyport "understands that [Owner A], his company, [Subcontractor A], and his connections in the Iraqi [MoD] coordinated the sole-source award of the AFAB BBS contract to [Vectrus]," and  "providing . . . information about [Owner A] regarding allegations of his corrupt practices").

of "Sallyport's purported evidence of concern," *id.* at 28-29, regarding Vectrus' updated list of subcontractors "until *after* contract award," *id.* at 29, and that "[i]n any event, the derogatory information that Sallyport submitted to the Air Force regarding [Subcontractor B] was immediately forwarded through several security channels . . . for review," *id.* at 30. Vectrus adds that "[t]he solicitation did not require subcontractor responsibility determinations, and contrary to Sallyport's assertions, there is no circumstance wherein the Air Force is obligated to perform responsibility determinations on subcontractors." [ECF 54-1] at 50. Furthermore, according to Vectrus, "[a]t the time of award there was nothing in the record suggesting it was in the [g]overnment's interest to conduct a responsibility determination on any of Vectrus's proposed subcontractors," *id.* at 51, and that "the best Sallyport can muster is a vague sentence from an anonymous source in a post-award email making this, at worst, a matter of contract administration," *id.*

"Responsibility determinations relate 'to an offeror's apparent ability and capacity to perform all contract requirements and [are made], not at proposal opening, but at any time prior to award of the contract based on any information received by the agency up to that time.'" *Newimar S.A.*, 160 Fed. Cl. at 125 (alteration in original) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009)). The FAR instructs that "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only," FAR 9.103(a), and that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility," FAR 9.103(b).[12] It further provides that "[a] prospective contractor must affirmatively demonstrate its responsibility, including, when necessary, the responsibility of its proposed subcontractors." FAR 9.103(c). To be determined responsible, a prospective prime contractor must meet seven general standards, including that it "[has] a satisfactory performance record," FAR 9.104-1(c), and "[has] a satisfactory record of integrity and business ethics," FAR 9.104-1(d). Where a prospective prime contractor has prospective subcontractors, the FAR states:

> (a) Generally, prospective prime contractors are responsible for determining the responsibility of their prospective subcontractors . . . . Determinations of prospective subcontractor responsibility may affect the Government's determination of the prospective prime contractor's responsibility. A prospective contractor may be required to provide written evidence of a proposed subcontractor's responsibility.

> (b) When it is in the Government's interest to do so, the contracting officer may directly determine a prospective subcontractor's responsibility (*e.g.,* when the prospective contract involves medical supplies, urgent requirements, or substantial subcontracting). In this case, the same standards used to determine a prime contractor's responsibility shall be used by the Government to determine subcontractor responsibility.

---

[12] If, however, there is an "absence of information clearly indicating that the prospective contractor is responsible," contracting officers are obligated to "make a determination of nonresponsibility." FAR 9.103(b).

FAR 9.104-4(a)-(b). "Contracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002) (quoting *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1334-35); *see also John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) ("Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision. . . . Thus, although the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so." (citations omitted)). To this end, the Court "cannot substitute [its] judgment for that of the contracting officer in making responsibility determinations." *Bender Shipbuilding & Repair Co.*, 297 F.3d at 1362; *accord John C. Grimberg Co.*, 185 F.3d at 1303 (stating that, in obtaining information to make a responsibility determination, "the contracting officer is the arbiter of what, and how much, information he needs"). Accordingly, when a contracting officer's responsibility determination "ha[s] a rational basis and [is] supported by the record, [it] will be upheld." *Bender Shipbuilding & Repair Co.*, 297 F.3d at 1362.

Here, the record shows that the Air Force satisfied its obligation under FAR Subpart 9.1 to conduct a responsibility determination of Vectrus. In conducting the responsibility determination of Vectrus, the contracting officer reviewed, among other materials, Vectrus's submitted capabilities, government registrations, past performance materials, and updated subcontractor information. *See* [ECF 39-2] ¶ 6 (declaration from contracting officer explaining responsibility determination process for Vectrus); AR 185-98 (Vectrus capabilities brief); AR 1181-1263 (System for Award Management ("SAM") FAR/DFARS report); AR 1265-69 (SAM entity detail report); AR 1270 (cybersecurity compliance assessment); AR 1271-72 (supplier performance risk report); AR 218-221 (past performance evaluation); AR 1174-75 (updated subcontractor list). Based on this information, the contracting officer determined that Vectrus has "a satisfactory performance record," AR 1178; that Vectrus has "a satisfactory record of integrity and business ethics," *id.*; and that, overall, Vectrus is "responsible within the definition of FAR 9.104," AR 1180. This evidence demonstrates that the Air Force complied with the requirements of FAR Subpart 9.1 when conducting its responsibility determination of Vectrus. *See* FAR 9.104-1 (general standards for responsibility determinations). Although Sallyport contends that the Air Force erred in conducting Vectrus's responsibility determination by not considering Vectrus's subcontractors, *see* [ECF 44-2] at 34, the Air Force is not obligated to review subcontractor responsibility as part of its determination of Vectrus's responsibility. Indeed, while the contracting officer has the right to require that Vectrus provide written evidence of a prospective subcontractor's responsibility, FAR 9.104-4(a), and the right to directly determine whether Vectrus's prospective subcontractors are responsible, FAR 9.104-4(b), the contracting officer is not obligated to do so. *See Konecranes Nuclear Equip. & Servs., LLC v. United States*, 165 Fed. Cl. 421, 434 (2023) (recognizing that the FAR does not require the government to make subcontractor responsibility determinations); *Caddell Constr. Co. v. United States*, 129 Fed. Cl. 383, 407 (2016) ("Contracting officers are generally given wide discretion in making responsibility determinations . . . and in deciding whether to assess a subcontractor's responsibility, contracting officers have heightened discretion.").

The Court is not persuaded by Sallyport's argument that the contracting officer acted arbitrarily by not exercising either his right to require that Vectrus demonstrate the responsibility of its proposed subcontractors or his right to make such responsibility determinations directly. *See* [ECF 44-2] at 35-36; [ECF 61] at 30-31. It was "within the contracting officer's purview" to decide whether to consider the responsibility of Vectrus's subcontractors when making the responsibility determination of Vectrus. *Acrow Corp. of Am. v. United States*, 97 Fed. Cl. 161, 178 (2011) (discussing *John C. Grimberg Co.*, 185 F.3d at 1303); *see* FAR 9.104-4(a) ("Determinations of prospective subcontractor responsibility *may* affect the [] determination of the prospective prime contractor's responsibility. A prospective contractor *may* be required to provide written evidence of a proposed subcontractor's responsibility" (emphasis added)); FAR 9.104-4(b) ("*[W]hen it is in the Government's interest to do so*, the contracting officer *may* directly determine a prospective subcontractor's responsibility" (emphasis added)). Based on the information before him, the contracting officer acted reasonably in not conducting responsibility determinations of Vectrus's subcontractors.

At the time of Vectrus's responsibility determination, the contracting officer had already determined that Subcontractor A was not responsible. AR 223 (Subcontractor A non-responsibility determination). He was also aware of Subcontractor A's known affiliates. AR 299 (acknowledging receipt of Subcontractor A activity report), 310-11 (list of related companies). Although Vectrus initially listed Subcontractor A and several of its affiliates as proposed subcontractors, AR 203-04, after the contracting officer notified Vectrus of Subcontractor A's non-responsibility determination and the related investigation, AR 199-200, 615, Vectrus provided an updated list of subcontractors that did not include Subcontractor A or its known affiliates, *see* AR 1174-75. Accordingly, it was reasonable for the contracting officer to believe that the risk posed by Subcontractor A and its affiliates had been eliminated. In addition, the letters Sallyport sent to the contracting officer after Contractor A withdrew its proposal but before the contract award to Vectrus did not raise new concerns regarding Vectrus or its updated list of subcontractors. Rather, the letters simply informed the contracting officer of Sallyport's concerns that Owner A and Subcontractor A were "reportedly working to support [Vectrus]," AR 1550-52 (May 8, 2025, letter); that Owner A was "working with the Minister of Defense and others to replace Sallyport," AR 1553-1555 (May 13, 2025, letter); that Iraqi MoD personnel were "engaged in a scheme to extort bribes or kickbacks from Sallyport vendors," AR 1556-58 (June 17, 2025, letter); and that "[Owner A], his company, [Subcontractor A], and his connections in the Iraqi [MoD] coordinated the sole-source award of the AFAB BBS contract to [Vectrus] [and that] . . . [Owner A] and his companies [would] play a significant role in performing the AFAB BBS follow-on contract," AR 1565-66 (June 25, 2025, letter).[13] While Sallyport's letters continued to raise concerns about Owner A, Subcontractor A, and its affiliates, they did not raise new concerns regarding Vectrus or its updated list of subcontractors. *See* AR 1174-75. Because Vectrus had removed Subcontractor A and its known affiliates from its subcontractor list and because there was no new information that raised concerns about Vectrus's subcontractors, it was reasonable for the contracting officer not to inquire into or otherwise

---

[13] Sallyport attached an investigative report to its June 25, 2025, letter, which analyzed Owner A, his connections to Iranian-backed militia groups, and his corporate affiliations. AR 1567-89.

directly determine the responsibility of Vectrus's subcontractors. *See Caddell Constr. Co.*, 129 Fed. Cl. at 407.[14]

Lastly, even if the Court were to find that the contracting officer acted arbitrarily by not considering the responsibility of Vectrus's subcontractors, Sallyport has not demonstrated that it was prejudiced. Sallyport argues that, had the Air Force considered the responsibility of Vectrus's subcontractors, the Air Force would have been precluded from awarding a sole source contract to Vectrus and would have been required under CICA to use full and open competition to award the contract. [ECF 44-2] at 37. This prejudice argument is too speculative. If the contracting officer had considered subcontractor responsibility, it is conceivable that one or more of Vectrus's subcontractors could have been found non-responsible. Such a finding, however, would not necessarily result in the contracting officer also finding Vectrus to be non-responsible because Vectrus could simply remove and replace the non-responsible subcontractor. Indeed, after learning of the non-responsibility determination of Subcontractor A, Vectrus removed Subcontractor A and its affiliates from its list of proposed subcontractors, AR 199-200, 1174-75, and the Air Force still found Vectrus to be responsible and awarded it the contract, AR 1180, 1276.[15] Also, the record shows that the Air Force considered potential findings of subcontractor non-responsibility to be "low risk" and subject to mitigation by allowing the prospective prime contractor to select another subcontractor. *See* AR 1542 (Air Force contracting official recognizing that corruption allegations surrounding Contractor A present "low risk" where there is no information implicating Contractor A in alleged misconduct and where Contractor A "could use another subcontractor") (emphasis and capitalization omitted); *see also* AR 1594-95 (email from the contracting officer to Contractor A indicating that Contractor A would be permitted to choose another subcontractor in lieu of withdrawing their proposal). Thus, an assessment of Vectrus's subcontractors' responsibility by the contracting officer would not have made his decision to make a sole source award to Vectrus, rather than to conduct a competitive procurement process, irrational. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086 ("A disappointed party [challenging the decision to sole source a contract] can establish prejudice by

---

[14] Sallyport also argues that Vectrus's "updated [subcontractor] list contains multiple causes for concern," [ECF 44-2] at 21, that a review of publicly available information suggests that several of the listed subcontractors (including Subcontractor B, the first listed subcontractor) are shell companies used to "evade the Air Force's non-responsibility determination," *id.* at 22, and that "[t]here is no contemporaneous documentation in the record to indicate that the Air Force evaluated these newly identified subcontractors in any meaningful way," *id.* at 20. However, the record does not show that the contracting officer ignored any specific information concerning Vectrus or its subcontractors in making his responsibility determination of Vectrus or in deciding to not assess the responsibility of its subcontractors. As discussed above, under FAR 9.104-4(a)-(b), the contracting officer is not required to perform subcontractor responsibility determinations, *see Konecranes Nuclear Equip. & Servs., LLC*, 165 Fed. Cl. at 434, nor is the contracting officer required to document the decision to not perform subcontractor responsibility determinations, *see Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1334 ("[T]he contracting officer is not required to explain the basis for his responsibility determination."). Moreover, even if the contracting officer were to consider subcontractor responsibility, the contracting officer is not required "to uncover information that could be retrieved in consulting the internet." *Acrow Corp. of Am.*, 97 Fed. Cl. at 179 (citing *Totolo/King, Joint Venture v. United States*, 89 Fed. Cl. 442, 445-46 (2009)).

[15] The contracting officer conducted post-award vetting of at least one of Vectrus' subcontractors, Subcontractor B, and "determined [Subcontractor B] to be a non-responsible subcontractor for the Iraq BBS requirement at [AFAB]." [ECF 55-1] ¶ 12. As a result, the contracting officer "notified Vectrus that [he] found [Subcontractor B] to be a non-responsible subcontractor . . . [and] directed Vectrus to begin the removal of [Subcontractor B] from [AFAB] immediately." *Id.*

showing . . . [that] proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, . . . and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award").

### C.   Sallyport Fails to Establish a Prejudicial Violation of the NCWE Act

Sallyport argues that the Air Force violated the NCWE Act by "fail[ing] to include [] mandatory provisions in the solicitation it issued to [Vectrus] or [in] the resulting contract." [ECF 44-2] at 33. Sallyport states that "the Air Force [] never sought the type of information it would need to facilitate vetting of [Vectrus's] subcontractors under the [Vendor Threat Mitigation ('VTM')] Program . . . [and that] once the Air Force learned the names of [Vectrus's] planned subcontractors, it disregarded the vetting process entirely." *Id.* Sallyport contends that "[h]ad the Air Force complied with [the NCWE Act's] implementing requirements, it would have found concerning connections between [Vectrus's] new planned subcontractors and Iranian militias." *Id.* at 33-34. Sallyport also claims that these connections "would have confirmed that the proceeds of any award to [Vectrus] would be flowing to Iranian militias . . . [and that] [a]ny reasonable evaluation of this information would have found that the Air Force could not award the contract to [Vectrus]." *Id.* at 34. According to Sallyport, in such circumstances, "the Air Force would have had to comply with CICA and hold a full and open competition for [the AFAB BBS] requirement." *Id.*

The government counters that "[t]he [NCWE] Act does not apply to this FMS case." [ECF 55] at 31. The government states that the NCWE Act applies to contracts in support of a contingency operation and that the services under Vectrus's awarded contract "do not support a contingency operation." *Id.* at 32. The government further argues that the NCWE Act "is concerned with providing American money to any entity actively opposing the United States," *id.*, and that because the contract to Vectrus "is funded entirely with Iraqi government funds . . . [the NCWE Act] is not implicated," *id.* Vectrus adds that "subcontractor vetting is a prime contractor responsibility," [ECF 54-1] at 46, and that "even if the [NCWE] Act does apply, the Air Force complied with any requirements" through its vetting of prime contractors, *id.* Vectrus also contends that, because "these clauses impose only post-award requirements related to contract administration . . . any purported omission [of the allegedly mandatory DFARS clauses] would not prejudice Sallyport." *Id.* at 47.

Passed as part of the FY 2015 NDAA, the NCWE Act sought to prohibit the provision of funds to those opposing the United States and coalition forces in combat operations. FY 2015 NDAA §§ 841(a), 842(a)(2), 843(6). Specifically, the NCWE Act states:

> The Secretary of Defense shall . . . establish in each covered combatant command a program to identify persons and entities within the area of responsibility of such command that—
>
> > (1) provide funds . . . received under a covered contract . . . of an executive agency directly or indirectly to a covered person or entity; or

(2) fail to exercise due diligence to ensure that none of the funds . . . received under a covered contract . . . of an executive agency are provided directly or indirectly to a covered person or entity.

FY 2015 NDAA, § 841(a). The NCWE Act defines a "covered combatant command" to include the United States Central Command ("CENTCOM"). *Id.* § 843(4)(B). Further, it defines a "covered contract" as "a contract . . . with an estimated value in excess of $50,000 that is performed outside the United States . . . in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities," *id.* § 843(5), and a "covered person or entity" as "a person or entity that is actively opposing United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities," *id.* § 843(6). Additionally, a "[c]ontingency operation" is defined as a military operation that "(A) is designated by the Secretary of Defense as an operation in which members of the armed forces are or may become involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force," 10 U.S.C. § 101(a)(13)(A), or "(B) results in the call or order to, or retention on, active duty of members of the uniformed services under . . . any [] provision of law during a war or during a national emergency declared by the President or Congress," *id.* § 101(a)(13)(B). *See* FY 2015 NDAA § 843(2) ("The term 'contingency operation' has the meaning given that term in section 101(a)(13) of title 10, United States Code.").

The NCWE Act also states that "the head of the executive agency concerned . . . and the commander of the covered combatant command concerned . . . shall be notified, in writing, of such identification of [a covered] person or entity," FY 2015 NDAA § 841(b)(1), and that "the head of the executive agency concerned . . . and the commander of the covered combatant command concerned . . . may notify the heads of contracting activities, or other appropriate officials of the agency or command, in writing of such identification," *id.* § 841(b)(2). The NCWE Act further requires that the FAR and DFARS be revised to grant authority to the head of the contracting activity or other appropriate official to restrict, terminate, or void contracts if it is determined that the contract "provides funds directly or indirectly to a covered person or entity," *id.* § 841(c)(3), or "that the contractor . . . has failed to exercise due diligence to ensure that none of the funds received under the contract . . . are provided directly or indirectly to a covered person or entity," *id.* § 841(c)(2).

The NCWE Act directs that the FAR and DFARS be revised to require the insertion of certain clauses in covered contracts. FY 2015 NDAA § 841(d)(1). Specifically, the NCWE Act mandates the insertion of clauses that "require[] the contractor . . . to exercise due diligence to ensure that none of the funds . . . received under the contract . . . are provided directly or indirectly to a covered person or entity," *id.* § 841(d)(2)(A), and "notif[y] the contractor . . . of the authority of the head of contracting activity, or other appropriate official, to terminate or void the contract . . . in whole or in part, as provided in subsection (c)," *id.* § 841(d)(2)(B). The NCWE Act also provides for the insertion of a clause in covered contracts that "authoriz[es] the head of the executive agency concerned . . . to examine any records of the contractor . . . or any subcontractor . . . to the extent necessary to ensure that funds . . . available under the contract . . .

25

are not provided directly or indirectly to a covered person or entity." *Id.* § 842(a)(2). This clause "may also be included in any subcontract . . . under a covered contract . . . if the subcontract . . . [is] in excess of $50,000." *Id.* § 842(a)(4).

To implement the NCWE Act, the DoD issued several class deviations.[16] According to Class Deviation 2024-O0003, "[c]ontracting officers shall include the clauses provided . . . in solicitations and contracts . . . with an estimated value in excess of $50,000 that will be performed outside the United States . . . in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities." Class Deviation 2024-O0003 at 1. The first provided clause implements § 841 as DFARS 252.225-7993:

> PROHIBITION ON PROVIDING FUNDS TO THE ENEMY (DEVIATION 2024-O0003) (DEC 2023)
>
> (a) The Contractor shall—
>
>> (1) Exercise due diligence to ensure that none of the funds, including supplies and services, received under this contract are provided directly or indirectly (including through subcontracts) to a person or entity who is actively opposing United States or Coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities;
>>
>> (2) Check the list of prohibited/restricted sources in the System for Award Management (SAM) at www.sam.gov—
>>
>>> (i) Prior to subcontract award; and
>>>
>>> (ii) At least on a monthly basis; and
>>
>> (3) Terminate or void in whole or in part any subcontract with a person or entity listed in SAM as a prohibited or restricted source pursuant to section 841 of the National Defense Authorization Act for Fiscal Year 2015 (Pub. L. 113-291), as amended, unless the Contracting Officer provides to the Contractor written approval of the head of the contracting activity to continue the subcontract.

---

[16] *See* DoD, Office of the Under Secretary of Defense For Acquisition and Sustainment, Class Deviation No. 2014-O0008, Prohibition on Contracting with the Enemy (2014), [https://perma.cc/PZM2-JCQ5]; DoD, Office of the Under Secretary of Defense For Acquisition and Sustainment, Class Deviation No. 2024-O0003, Prohibition on Providing Funds to the Enemy and Authorization of Additional Access to Records (2024), [https://perma.cc/SDH6-7AJY] [hereinafter Class Deviation 2024-O0003]. Class Deviation 2024-O0003 was in effect when the Air Force awarded the follow-on AFAB BBS contract to Vectrus on June 25, 2025. *Compare* Class Deviation 2024-O0003 (in effect from December 22, 2023, to December 31, 2025), *with* AR 1276 (contract award to Vectrus dated June 25, 2025).

(b) The Head of the Contracting Activity has the authority to—

(1) Terminate any contract for default, in whole or in part, if the Head of the Contracting Activity determines in writing that the contractor failed to exercise due diligence, as required by paragraph (a) of this clause; or

(2)(i) Void any contract, in whole or in part, if the Head of the Contracting Activity determines in writing that any funds received under this contract have been provided directly or indirectly to a person or entity who is actively opposing United States or Coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

* * *

(c) *Subcontracts*. The Contractor shall include the substance of this clause, including this paragraph (c), in subcontracts, including subcontracts for commercial products and commercial services, under this contract that have an estimated value over $50,000 and will be performed outside the United States and its outlying areas.

*Id.* at 3-4. The second clause implements § 842 as DFARS 252.225-7975:

ADDITIONAL ACCESS TO CONTRACTOR AND SUBCONTRACTOR RECORDS (DEVIATION 2024-O0003) (DEC-2023)

(a) In addition to any other existing examination-of-records authority, the Government is authorized to examine any records of the Contractor and its subcontractors to the extent necessary to ensure that funds, including supplies and services, available under this contract are not provided, directly or indirectly, to a person or entity that is actively opposing United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

(b) *Subcontracts*. The substance of this clause, including this paragraph (b), is required to be included in subcontracts, including subcontracts for commercial products and commercial services, under this contract that have an estimated value over $50,000 and will be performed outside the United States and its outlying areas.

*Id.* at 5.

27

Further, the DoD issued DoD Directive 3000.16,[17] which "establishes policy and assigns responsibilities for [VTM]," DoD Directive 3000.16 at 1, and implements "a VTM program to identify, vet, and address threats posed by vendors that oppose U.S., allies', and partners' interests or pose a threat to national security, and to mitigate risks as appropriate," *id.* § 1.2(b)(1). The directive granted the DoD Under Secretary of Defense for Acquisition and Sustainment the responsibility of "[i]ntegrat[ing] VTM activities into strategic planning, acquisition, sustainment, and financial processes." *Id.* § 2.1(c). It also granted the DoD component heads the responsibility of "[i]dentify[ing] vendor risks, review[ing] vendor threat reports, and prohibit[ing] contracting with adversaries using all available sources of information and intelligence," *id.* § 2.8(a), and the responsibility of "[e]ngag[ing] with prime contractors through the designated head of the contracting activity to identify and mitigate potential risk to national security posed by individuals and subcontractors," *id.* § 2.8(d).

Pursuant to the NCWE Act and DoD Directive 3000.16, CENTCOM created Central Command Regulation 715-2 ("CCR 715-2"), which "provides [CENTCOM] guidance on the processes, procedures, and responsibilities of the [VTM] Program." AR 145 (CCR 715-2 at 1). The regulation states:

> VTM is a continuous process by which intelligence, counterintelligence, law enforcement, financial, and contract information are used to protect U.S. and Coalition Forces and prevent the flow of U.S. funds, or any other form of support to covered persons and entities engaging in covered activities. The [CENTCOM] VTM program assesses persons or entities to produce an integrated, comprehensive, and timely analysis. This analysis will allow [Risk Mitigation Plan Approval Authorities ("RMPAA")] to make informed decisions about risks associated with a vendor in the [CENTCOM Area of Responsibility ("AOR")]. . . . Persons or entities exposing U.S. or Coalition Forces to risk shall be denied access to U.S. or Coalition property, personnel, equipment, and information unless the RMPAA approves a risk mitigation plan or otherwise accepts the risk for that person or entity.

AR 154 (CCR 715-2 § 3.1(a)). The regulation also states:

> All prime vendors with a [covered contract] within the [CENTCOM] AOR must be vetted prior to contract award. All prime vendors must complete vetting of all their subcontractors and respective personnel to ensure compliance with [the NCWE Act], to include providing access to any and all records related to both vetting and contracting requirements. When any derogatory information on a subcontractor is found by the prime vendor, RMPAA, [head of contracting activity], or other stakeholder, that information shall be immediately shared with VTM. Information

---

[17] DoD, Office of the Under Secretary of Defense for Acquisition and Sustainment, Directive No. 3000.16, Vendor Threat Mitigation at 1 (2022), [https://perma.cc/3KY3-299L] [hereinafter DoD Directive 3000.16].

> regarding any potential violation of [the NCWE Act] shall be incorporated into the VTM process.

AR 154 (CCR 715-2 § 3.1(b)). Additionally, the regulation states that "[p]rior to awarding a [covered contract], issuing a modification or exercising an option, [contracting officers] must use the designated VTM system to verify that the vendor has a valid rating, and, if applicable, [a risk mitigation plan]," AR 155 (CCR 715-2 § 3.1(e)), and "shall ensure awarding [a covered contract] . . . [is] limited to those vendors who have a current acceptable rating, or a current rating of [unacceptable without mitigation] with an approved [risk mitigation plan]," *id.* In practice, CENTCOM's VTM program implements its vendor vetting through the Joint Contingency Contracting System ("JCCS"). *See* AR 100, 132.

Based on the record before it, the Court is unable to determine whether the AFAB BBS follow-on contract constitutes a "covered contract" under the NCWE Act. As noted above, the NCWE Act defines a covered contract as one "with an estimated value in excess of $50,000 that is performed outside the United States . . . in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities." FY 2015 NDAA § 843(5). Here, the AFAB BBS contract is valued in excess of $50,000, *see* AR 1278-87,[18] and is being performed outside the United States, AR 1288. However, it is unclear whether the AFAB BBS contract is in support of a contingency operation. On the one hand, both the government and Vectrus contend that the AFAB BBS contract does not support a contingency operation. [ECF 55] at 32 (the government stating that "[t]he BBS services outlined in the [] award[] to Vectrus do not support a contingency operation"); [ECF 54-1] at 45 n.16 (Vectrus stating that "AFAB is an Iraqi base—not a U.S. base—and it does not support 'contingency operations'"). On the other hand, the contracting officer states that "the majority of [AFAB BBS] services . . . are critical to maintaining the United States' Operation Inherent Resolve mission." [ECF 55-1] ¶ 5. Further, according to a report to Congress, Operation Inherent Resolve is a contingency operation that formally concluded in Iraq in July 2025. *See* Off. of Inspector Gen., U.S. DoD, U.S. Dep't of State, & U.S. Agency for Int'l Dev., Operation Inherent Resolve: Lead Inspector General Report to the United Stated Congress July 1, 2025-December 31, 2025, at 2, 10-11 (2026) [https://perma.cc/7CNU-5EMT]. The report also states that, "[a]s of the end of December [2025], the DoD planned to continue [its contingency operations] in Syria, *supported from* Iraq, through at least September 2026." *Id.* at 11 (emphasis added). Based on this information, the Court could conclude that the NCWE Act applies to the contract because Vectrus's award date, June 25, 2025, AR 1276, is prior to the conclusion of Operation Inherent Resolve in Iraq in July 2025 and because the DoD planned to continue contingency operations in Syria with support from Iraq after July 2025. Nonetheless, the Court need not resolve this issue because, even assuming that the NCWE Act is applicable, Sallyport has not demonstrated that it was prejudiced by the Air Force's failure to include the required clauses in the solicitation and contract with Vectrus or by the Air Force's failure to use the VTM program to vet Vectrus's subcontractors.

---

[18] The Court is not persuaded by the government's and Vectrus's contentions that the NCWE Act is not implicated because the contract is "funded entirely with Iraqi Government funds" rather than by "American money." [ECF 55] at 32; *see also* [ECF 54-1] at 45 (Vectrus stating that "as an FMS contract[,] the BBS Contract is entirely funded by Iraq, and thus its value to the U.S. does not exceed $50,000"). The NCWE Act and its implementing regulations discuss contract value, without specifying the source of the funds. *See generally* FY 2015 NDAA § 843(5); DoD Directive 2024-O0003. Accordingly, the Air Force's contract with Vectrus satisfies the NCWE Act's value requirement to be a covered contract because the contract value clearly exceeds $50,000.

The record demonstrates that the Air Force did not include DFARS 252.225-7993 or 252.225-7975 in the solicitation or contract provided to Vectrus. AR 760, 810, 816-18 (solicitation); AR 1276, 1305, 1320 (contract). However, the Air Force's failure to include these clauses did not prejudice Sallyport. DFARS 252.225-7993 creates obligations for the contractor *after* contract award. DFARS 252.225-7993(a)(1) ("The Contractor shall . . . [e]xercise due diligence to ensure that none of the funds, including supplies and services, received *under this contract* . . . " (emphasis added)). Likewise, DFARS 252.225-7993 and -7975 grant certain authorities to the government that may be exercised *after* contract award. DFARS 252.225-7993(b) ("The Head of the Contracting Activity has the authority to . . . [t]erminate any contract for default . . . or . . . [v]oid any contract . . ." (emphasis added)); DFARS 252.225-7975(a) ("[T]he Government is authorized to examine any records of the Contractor and its subcontractors to the extent necessary to ensure that funds . . .  available *under this contract* . . ." (emphasis added)). While the absence of these clauses in the solicitation and contract may impact the Air Force's authority during contract administration, it does not render the Air Force's decision to make a sole source award to Vectrus, rather than to conduct a competitive procurement, irrational. *See Emery Worldwide Airlines, Inc.*, 264 F.3d at 1086 ("A disappointed party [challenging the decision to sole source a contract] can establish prejudice by showing . . . [that] proceeding without the violation would have made the . . .  decision to make a sole-source award rather than to conduct a competitive bidding process irrational, . . . and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award").

Additionally, while these clauses grant the government the authority to terminate or void contracts, *see* DFARS 252.225-7993(b), and the authority to examine records of contractors and subcontractors, *see* DFARS 252.225-7975(a), they do not obligate the government to exercise that authority. Moreover, even if the government were to examine the records of Vectrus and its subcontractors, that would not necessarily result in a finding that Vectrus or its subcontractors failed to exercise due diligence, let alone a finding that such failure warranted termination or voiding of Vectrus's or its subcontractors' respective contracts. Therefore, the Air Force's failure to include DFARS 252.225-7993 and -7975 within the AFAB BBS solicitation and contract does not render the contracting officer's decision to sole source the AFAB BBS contract irrational.

Notwithstanding the Air Force's failure to include these clauses in the solicitation and contract, the record shows that the Air Force adhered to the vetting requirements under the VTM program. The VTM program mandates that "[a]ll *prime vendors* with a [covered contract] within the [CENTCOM] AOR [] be vetted prior to contract award." AR 154 (emphasis added) (CCR 715-2 § 3.1(b)). Here, the contracting officer vetted Vectrus using JCCS prior to award and found Vectrus's VTM risk rating to be "[a]cceptable [w]ithout [m]itigation." AR 888.1-888.2; *see* [ECF 39-2] ¶¶ 6, 17. The contracting officer, therefore, satisfied the VTM program's vendor vetting requirement. *See* AR 158 (CCR 715-2 § 3.2(b)(1) stating that "[t]he contracting officer may contract with any acceptable rated vendor within the [CENTCOM] AOR"). Although Sallyport argues that "the Air Force [] never sought the type of information it would need to facilitate vetting of [Vectrus's] subcontractors under the VTM Program," [ECF 44-2] at 33, the Air Force was not obligated to do so. Under CCR 715-2, prime contractors are assigned the responsibility of vetting their subcontractors and conveying any derogatory information to the contracting officer. AR 154 (CCR 715-2 § 3.1(b) stating that "[a]ll prime vendors must complete

30

vetting of all their subcontractors and respective personnel to ensure compliance with [the NCWE Act]").[19] As such, the contracting officer was not obligated to vet Vectrus's subcontractors using JCCS prior to award, and acted reasonably in not doing so where there was no derogatory information on Vectrus's subcontractors.[20]

Furthermore, even if the contracting officer was obligated to vet Vectrus's subcontractors using the VTM program, such vetting would not necessarily result in Vectrus not receiving the sole source award, or render the contracting officer's decision to award the AFAB BBS contract on a sole source basis irrational. If a subcontractor is found to be "unacceptable without mitigation" under the VTM program, the VTM procedures provide that an RMPAA may nevertheless "approve[] a risk mitigation plan or otherwise accept[] the risk for that person or entity." AR 154 (CCR 715-2 § 3.1(a)); *see* AR 158 (CCR 715-2 § 3.2(b)(2)). Additionally, such a rating for a subcontractor does not automatically result in an unacceptability rating for the prime contractor. AR 158 (CCR 715-2 § 3.1(h) stating that "[i]f the VTM program obtains any derogatory information about the person, entity, or vendor, any subcontractor or employee, the VTM program *may* initiate a new review, and change that vendor's rating accordingly." (emphasis added)). In sum, Sallyport fails to establish that it was prejudiced by the Air Force's failure to include the required clauses under the NCWE Act in Vectrus's solicitation or contract or by the contracting officer's failure to vet Vectrus's subcontractors using VTM procedures.

## IV.    CONCLUSION

Accordingly, the Court **DENIES** the government's and Vectrus's motions to dismiss Sallyport's complaint, [ECFs 54, 55]; **DENIES** Sallyport's motion for judgment on the administrative record, [ECF 44]; and **GRANTS** the government's and Vectrus's cross-motions for judgment on the administrative record, [ECFs 54, 55].[21] The Court **FINDS AS MOOT** Sallyport's motion to complete the administrative record, [ECF 34], and Vectrus's motion to supplement its cross-motion for judgment on the administrative record, [ECF 66]. The Clerk is **DIRECTED** to enter judgment accordingly.

---

[19] Sallyport contends that "the plain language under the law . . . repeatedly confers responsibility on the agency to 'to identify and mitigate potential risk to national security posed by individuals and subcontractors.'" [ECF 61] at 28 (quoting DoD Directive 3000.16 § 2.8(d)). However, the full text of DoD Directive 3000.16 § 2.8(d) requires that the DoD component head "*[e]ngage with prime contractors* through the designated head of the contracting activity to identify and mitigate potential risk to national security posed by individuals and subcontractors." (emphasis added). Sallyport also suggests that CCR 715-2 specifically requires the Air Force to vet subcontractors prior to award. *See* [ECF 61] at 28 (citing various sections from CCR 715-2). Yet, none of the CCR 715-2 sections cited by Sallyport create such requirement. *See* AR 152-169, 172 (requiring the government to vet prime contractors under the VTM program and requiring prime contractors to vet subcontractors).

[20] Under CCR 715-2 § 3.1(b), "[w]hen any derogatory information on a subcontractor is found by the prime vendor . . . or other stakeholder, that information shall be immediately shared with [the] VTM [support cell]." Here, after receiving derogatory information regarding Subcontractor A before the contract award to Vectrus, the contracting officer complied with this requirement by providing the information to Air Force leadership and the VTM support cell. [ECF 39-2] ¶¶ 7-8; *see also* AR 300-17 ([* * *] Contractor Activity Report on Subcontractor A developed by the VTM support cell). Similarly, upon receiving derogatory information regarding Subcontractor B after contract award, the contracting officer provided the information to the VTM support cell. [ECF 55-1] ¶¶ 6-12.

[21] [* * *]

Some information contained in this Opinion and Order may be considered protected information subject to the Amended Protective Order, [ECF 29], entered on July 21, 2025. Accordingly, the Opinion and Order is **FILED UNDER SEAL**. The parties **SHALL FILE by no later than June 5, 2026**, a joint status report that identifies information, if any, that the parties contend should be redacted; explains the basis for each proposed redaction; and includes an attachment of the proposed redactions for this Opinion and Order.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge